UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Docket No.: 1:21-cv-11986

|  |  |
|---|---|
| _____ | ) |
| LIBERTY MUTUAL INSURANCE COMPANY, | ) |
| a/s/o MARC RYSMAN, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| BROAN-NUTONE LLC, | ) |
|  | ) |
| Defendant. | ) |
| _____ | ) |

**PLAINTIFF, LIBERTY MUTUAL INSURANCE COMPANY, a/s/o MARC RYSMAN'S, OPPOSITION TO DEFENDANT BROAN-NUTONE LLC'S MOTION TO EXCLUDE UNRELIABLE OPINIONS OF JEREMIAH PRATT**

**I.     INTRODUCTION**

Liberty Mutual Insurance Company, a/s/o/ Marc Rysman, ("LMIC"), brought this subrogation action to recover payments made to its insured as a result of a fire at the Rysman's home on December 17, 2018. In its Complaint against Broan-NuTone LLC, ("Broan"), LMIC has alleged the subject fire occurred within a Broan ceiling mounted vent-light fixture. (Complaint, ¶ 6.) The Plaintiff has made a claim of negligence (Count 1), breach of implied warranty of merchantability (Count 2), breach of implied warranty of fitness for particular purpose (Count 3), and violation of General Laws Chapter 93A (Count 4). (*Id.*, ¶¶ 11-24.)

The Plaintiff retained the services of expert, Jeremiah Pratt, P.E., CFI, CFEI, CVFI ("Pratt"), to determine the origin and cause of the subject fire. Broan seeks to exclude the testimony of one of the most knowledgeable fire and explosion experts in the country, disingenuously arguing that he reached his opinions based on unreliable methodology under the

1

*Daubert* standard. This argument is unsupported by existing case law and belied by the record. For the reasons set forth below the Defendant's Motion to Exclude Unreliable Opinions of Jeremiah Pratt ("Motion to Exclude") must be denied.

## II.   <u>STATEMENT OF THE CASE</u>

As of December 17, 2018, LMIC's insureds, Marc Rysman, Michelle Ephraim lived in their 181 Clark Road, Brookline, Massachusetts, home with their four children. (Ex. 4, Marc Rysman 1:13-12:16.) On December 17, 2018, Ava Rysman, then a high school senior, got home from school, was the only person in the house, heard "popping and footsteps", which got louder, the alarm started beeping softly which also got louder, she left the house and called 911. (Ex. 6, Ava Rysman 14:15-18:9.) As a result of the fire, the Rysman home was unlivable until repaired and the Plaintiff paid to or on behalf of its insureds in excess of $900,000.00. (Ex. 1, Ans. Interrog. 14.)

On or about December 18, 2018, Michael J. Peters of LMIC contacted Jeremiah Pratt to assist with the origin and cause analysis of the fire at 181 Clark Road, Brookline. (Ex. 2, Jeremiah Pratt Report and CV, Report p. 7.) Pratt inspected the loss site on December 20, 2018. (*Id.*, p. 8.) On January 9, 2019, a joint scene examination at 181 Clark Road took place; in attendance were Jeremiah Pratt on behalf of LMIC, Jim Seippel of Broan on behalf of Broan, James Rogers of Bay State Inspectional Agency on behalf of Broan. (*Id.*, p. 9.) The scene was processed, and all parties were given the opportunity to inspect the scene and any evidence, as well as request the retention of any additional evidence. (*Id.*)

Four items were taken into storage subsequent to the January 9th inspection:

1. Fan Component from Floor Debris;
2. Ceiling Fan Artifacts;
3. Exemplar Fan from Second Floor Bathroom; and
4. Wiring from 2nd Floor Bathroom Ceiling.

On October 29, 2019, a joint laboratory examination of evidence recovered from 181 Clark Road, took place; in attendance was Jeremiah Pratt on behalf of LMIC, Jim Seippel of Broan on behalf of Broan, James Smolka of ESI on behalf of Broan and Melanie Dadah of the Wright Group on behalf of LMIC. (*Id.*, p. 9.)

Subsequent to the above-noted actions, Pratt utilized the basic methodology in his investigation of the subject fire pursuant to the well-established and court approved scientific methods, (Recognize the need, Define the problem, Collect data, Analyze the data, Form hypotheses, Test the hypotheses, Select a final hypothesis), as set forth in Chapter 4 of NFPA 921, Guide for Fire and Explosion Investigations, 2021 Edition. (Ex. 2.)

On or about October 28, 2022, the Plaintiff disclosed the expert opinion/report/CV of Pratt. (Ex. 2.) Broan took Pratt's deposition. (Ex. 3, Pratt Transcript.) Pratt followed the methodology, guidelines, and principles of NFPA 921 and NFPA 1033. In doing so, he concluded the area of origin was in the ceiling void space between the second floor bathroom and the third floor crawl space. (Ex. 3, 33:4-16.), (Ex. 2, pp. 5, 9-12.) This meticulous collection and analysis of available data led to the development of several hypotheses as to the origin of the subject fire. (Ex. 2, p. 12.) Following the guideline principles of NFPA 921, 2021, Pratt's hypothesis testing was iterated to completion with the remaining hypothesis selected as the most probable hypothesis. (Ex. 2, p. 21.) Pratt validated the cause and origin of the subject fire according to the guidelines set forth in NFPA 921, NFPA 1033 and the principles of scientific method. He concluded that the ignition source of the fire was electrical activity in the fan connection junction box that ignited lightweight combustibles in the form of dust and lint due to the abrasion of wire as a result of normal long term fan vibration. (Ex. 2, p. 22.)

### III.   <u>CONCISE STATEMENT OF MATERIAL FACTS</u>

1.  Exhibit 1 is a true and accurate copy of the Plaintiff, LM General Insurance Company's

    Answer to Defendant, Broan-Nu Tone LLC's First Set of Interrogatories.

    Admitted. Note the caption is misnamed LM General Insurance Company but should

    read Liberty Mutual Insurance Company's Answers to Defendant, Broan-NuTone LLC's

    First Set of Interrogatories.

2.  Exhibit 2 is a true and accurate copy of expert report of Jeremiah Pratt.

    Admitted Exhibit 2 is a true and accurate copy of expert report of Jeremiah Pratt

    including Appendix B – Curriculum Vitae for Jeremiah Pratt[1].

3.  Exhibit 3 is a true and accurate copy of the transcript of the July 19, 2023, deposition of

    Jeremiah Pratt.

    Admitted.

4.  Exhibit 3 is a true and accurate copy of the transcript of the June 2, 2022, deposition of

    Marc Rysman.

    Admitted.

5.  Exhibit 3 is a true and accurate copy of the transcript of the August 16, 2023, deposition

    of Michelle Ephraim.

    Admitted.

---

[1] Broan does not question Jeremiah Pratt's impeccable qualifications as an expert to provide testimony as a fire origin and cause expert. Pratt is eminently qualified. Pratt is a licensed professional engineer (P.E.) with a degree in electrical engineering from Worcester Polytechnic Institute. He has worked in the industry for both commercial and Department of Defense sectors for 14 years. His experience includes a wide range of product systems, including microwave systems, military technology, utilities, robotics, residential and commercial building wiring, magnetism, semiconductor processing equipment, FDA-approved medical devices, automation systems. Pratt has been engaged as a certified (CFI, CFEI, CVFI) origin and cause fire investigator/failure analyst for over 10 years, he has provided expert testimony in numerous depositions, arbitration and has testified as an expert in court. Additionally, Pratt has over 25 years of practical hands-on firefighting experience with extensive classroom and live burn training and is currently the Massachusetts District 7 Fire Investigation Unit Training Coordinator. <u>See</u> Pratt's CV, Appendix B to Exhibit 1.

6. Exhibit 3 is a true and accurate copy of the transcript of the August 16, 2023, deposition of Ava Rysman.

   Admitted.

7. Exhibit 7 is a true and accurate copy of a portion of the transcript of the October 18, 2023, deposition of Stephen Campolo.

   Admitted.

8. Exhibit 8 is a true and accurate copy of the entire transcript of the October 18, 2023, deposition of Stephen Campolo[2].

## IV.   ARGUMENT

### A.   Standard Of Review

Admissibility of expert testimony is guided by Federal Rule of Evidence 702, as amended, which provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

"Put simply, an expert's testimony must be relevant and reliable." _Woods Hole Oceanographic Institution v. ATS Specialized, Inc._, 2021 WL 9860239, at *4, (D. Mass. May 27, 2021), citing, _Daubert v. Merrell Dow Pharm., Inc._, 509 U.S. 589 (1993).

"In applying Rule 702, the district court serves as the gatekeeper for expert testimony by 'ensuring that [it] … both rests on a reliable foundation and is relevant to the task at hand.'"

*Milward v. Rust-Oleum*, 820 F.3d 469, 473 (1st Cir. 2016), (quoting *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786). "The reliable foundation requirement necessitates an inquiry into the methodology and the basis for an expert's opinion," while the "adequate fit" requirement "seeks to ensure there is an adequate fit between an expert's methods and his conclusions. *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31-32 (1st Cir. 2012). This second requirement "addresses the problem that arises when an expert's methods, though impeccable, yield results that bear a dubious relationship to the questions on which he proposes to opine." *Id.* A party seeking to introduce evidence has the burden of establishing both its reliability and its relevance. *Milward*, 820 F.3d at 473.

"Reliability is a flexible inquiry, allowing for consideration of factors such as whether the expert's methodology has been objectively tested; whether it has been subjected to peer review and publication; the technique's known or potential error rate; and whether the expert's technique has been generally accepted within the relevant industry." *Lawes v. CSA Architects and Engineers LLP*, 963 F.3d 72, 98 (1st Cir. 2020) (citing *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 14 (1st Cir. 2011)). "At the end of the day, however, the focus must be solely on principles and methodology." *Id.* (internal quotation marks and modifications omitted) (citing *Daubert*, 509 U.S. at 594-595, 113 S.Ct. 2786). Excluding evidence on a truncated summary judgment record, as here, is disfavored.

The First Circuit has held at the summary judgment stage that the gatekeeping functions *Daubert* requires "should be employed only with great care and circumspection at [that] stage." *Cortés-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997),

---

[2] Broan, apparently for strategic reasons, chose only to include a few select portions of Stephen Campolo's deposition transcript. Plaintiff, in contrast, includes Stephen Campolo's entire deposition transcript for the Court's review and consideration.

cited with approval in _Netherlands Ins. Co. v. HP, Inc._, 646 F. Supp. 3d 139, 146 (D. Mass.

2022). Accordingly, the First Circuit has expressly cautioned against excluding evidence without

allowing an opportunity to defend its admissibility. _Netherlands_, 646 F. Supp. 3d at 146. Broan's

burden is a "high" one to overcome. _Netherlands_, 646 F. Supp. 3d at 153. Broan has not met that

high burden.

In determining reliability, courts "must stop short of weighing the evidence, evaluating

credibility, or unnecessarily picking sides in a battle between experts." _Lawes_, 963 F.3d at 98.

"So long as an expert's scientific testimony rests upon 'good grounds, based on what is known,'

it should be tested by the adversarial process." _Id._ (quoting _Milward_, 639 F.3d at 15). The

"reliability" bar, however, cannot be met "by an expert's self-serving assertion that his

conclusions were derived by the scientific method." _Id._ Similarly, the court is not required "to

admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." _Id._

(quoting _General Elec. Co. v. Joiner_, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508

(1997)).

On the other hand, "_Daubert_ does not require that a party who proffers expert testimony

carry the burden of proving to the judge that the expert's assessment of the situation is correct."

_Lawes_, 963 F.3d at 99. Rather, "to satisfy _Daubert's_ objective, the proponent must show 'that the

expert's conclusion has been arrived in a scientifically sound and methodologically reliable

fashion.'" _Id._ (quoting _Milward_, 639 F.3d at 15). "Vigorous cross examination, presentation of

contrary evidence, and careful instruction on the burden of proof are the traditional and

appropriate means of attacking shaky but admissible evidence." _Id._ (citing _Daubert_, 509 U.S. at

596, 113 S.Ct. 2786). That is precisely what should occur in this case – vigorous cross-

examination of an expert at trial testing Pratt's reliance on the time-tested principles of NFPA on

which he expressly based his expert opinions. The Motion to Exclude should, therefore, be denied.

**B.      Opinions Based NFPA 921 Principles, Guidelines and Methodology are Reliable.**

Analogous to the expert, Mr. Harris, in reaching his opinion in _Woods Hole Oceanographic Institution_, Pratt applied the methodology set forth by NFPA 921, which is a peer reviewed and generally accepted standard in the fire investigation community. _United States v. Hebshie_, 754 F. Supp. 2d 89, 109 n. 39 (D. Mass. 2010) ("NFPA 921 … is widely accepted as the standard guide in the field of fire investigations"); _Netherlands_, 646 F. Supp. 3d at 145-46; _Travelers Indem. Co. v. Indus. Paper & Packaging Corp._, No. 3:02-CV-491, 2006 WL 1788967, at *4 (E.D. Tenn. June 27, 2006) (collecting cases); _see_ _also_ _Erie Ins. Co. v. Sunbeam Prods._, No. 2:12-cv-00703, 2015 WL 127894, at *4, 2015 U.S. Dist. LEXIS 2437, at *11 (S.D. Ohio Jan. 8, 2015) ("NFPA-921 is a recognized guide for assessing the reliability of expert testimony in fire investigations.") (citations omitted); _Medina v. Daimler Trucks N. Am., LLC_, No. 10-623, 2014 WL 7405210, at * 7, 2014 U.S. Dist. LEXIS 178419, at *16 (D.N.J. Dec. 30, 2014) (NFPA 921 is "an authoritative source for the proper methodologies for evaluating the cause and origin of fires ..."). Thus, the overwhelming majority of courts have found expert opinions based upon NFPA 921 to be sufficiently reliable under _Daubert_.

The methodology Pratt used is the same methodology widely accepted in the fire investigation field under the standard of care guide, (NFPA 921 Guide for Fire and Explosion Investigations); namely, recognize the need, define the problem, collect data, analyze the data, form hypotheses, test the hypotheses and select a final hypothesis. _Woods Hole Oceanographic Institution_, 2021 WL 9860239, at *5. First, Pratt "Recognized the need" – he recognized the need when he was contacted by Liberty Mutual internal SIU investigator Michael Peters who

needed the fire investigated. (Ex. 2, p. 8.) Second, Pratt "Defined the problem"; the problem was

that the fire occurred, and an origin and cause needed to be determined. (Ex. 2, p. 8.) Third, Pratt

"Collected Data", i.e., Witness Statements, Fire Patterns, Fire Dynamics, etc. Data was collected

through a thorough investigation including interviews. Two site visits were held (December 20,

2018, and January 9, 2019) and an interview with Mr. Rysman also occurred. (Ex. 2, pp. 10-12.)

Fourth, Pratt "Analyzed Data." Fire dynamics were analyzed in relation to the fire patterns s

were witness statements. He stated that data analysis happens concurrent with the data collection.

"While the articulation of this process is individualized (i.e., collect the data then analyze the

data), in practice however, the two tasks are undeniably linked." (Ex. 2, pp. 10-12.).

Guided by NFPA 921, Pratt then "Developed Hypotheses." Hypotheses are developed as

the byproduct of analysis of the collected data in a process of "Inductive Reasoning." (NFPA 921

Section 4.3.5 and Section 18.5.) The origin hypotheses Pratt developed (Hypothesis #1, #2, and

#3, Ex. 2, p. 12) were developed as the result of Pratt's collection and analysis of the origin data.

Pratt went on to "Test Hypotheses." NFPA 921 (Section 4.3.6 and Section 18.6.1-

18.6.1.3) describes the testing of origin hypotheses as "Deductive Reasoning." (NFPA 921

Section 4.3.6.) "Testing of the hypothesis is done by the principle of deductive reasoning, in

which the investigator compares the hypothesis to all known facts as well as the body of

scientific knowledge associated with the phenomena relevant to the specific incident." Pratt

utilized his training, education, and experience along with scientific knowledge from the

standards, publications, and peer-reviewed authoritative documents he cited as information relied

upon (Ex. 2, p. 8) to formulate hypotheses as to potential areas where the fire could have

originated. Pratt demonstrates the comparison of the developed hypotheses to the facts and data

collected in regard to the origin investigation. (Ex. 2, pp. 12-13.) NFPA 921 also states (Section

4.3.6) "A hypothesis can be tested physically by conducting experiments, analytically by applying accepted scientific principles, or by referring to scientific research." Pratt's methodology in testing various origin hypotheses cognitively against one another and using the facts and generally accepted scientific knowledge was not only acceptable but represented the preferred and recommended methodology dictated by the gold standard of fire investigation practices, NFPA 921.

After specifically following the above-noted NFPA 921 methodological steps 1-6, Pratt went on to "Select Final Hypothesis." NFPA 921 Section 18.7 describes an iterative process in which you first double check that all "credible" data has been accounted for and all "credible" alternate origin hypotheses have been considered. "Once the hypotheses regarding the origin of the fire have been tested, the investigator should review the entire process, to ensure that all credible data are accounted for and all credible alternate origin hypotheses have been considered and eliminated." (NFPA 921 Section 18.7.), (Ex. 2, p. 13)

Pratt's Report (Ex. 2) further shows that he went back and applied the scientific method for an additional round in conducting the cause investigation. He applied the same NFPA endorsed methodology to the cause determination. The identical NFPA 921 methodology (Recognize the need, Define the problem, Collect data, Analyze the data, Form hypotheses, Test the hypotheses, Select a final hypothesis) was followed.

1) "Recognize the need" – (Ex 2, p. 8.);

2) "Define the problem" – Again, the problem was that the fire occurred, and an origin and cause (second round of use of the scientific method) needed to be determined. (Ex 2, p. 8.);

10

3)      "Collect data" (Competent Ignition Source, Type and Form of First Fuel,
Mechanism that brought the fuel and ignition source together) – Data was collected from within
the area of origin through a thorough examination of the artifacts which was conducted in the
laboratory on October 29, 2019. Several photographs of the data collection at the examinations
are shown on pages 11-19 of Ex 2. NFPA 921 Section 19.3 describes that the ignition sources
analyzed as data are from within the area of origin. The origin had already been narrowed by the
first round of use of the NFPA 921 scientific method. The defense can dispute the conclusion but
cannot dispute the use of the scientific method used to arrive at the conclusion.

4)      "Analyze data" – As described above, the analysis of the data is a concurrent
process. (Ex. 2, p. 10.) Again, data analysis often happens concurrent with the data collection.
"While the articulation of this process is individualized (i.e., collect the data then analyze the
data), in practice however, the two tasks are undeniably linked." (NFPA 921 Section 19.4.)
"Analyzing the data requires the examination and interpretation of each component of data
collected for its role in the fire cause… Analysis of the data is based on the knowledge, training,
experience, and expertise of the individual doing the analysis. (Ex. 2, pp. 14-19.)

5)      "Develop hypotheses" – As articulated in NFPA 921, hypotheses are developed as
the byproduct of analysis of the collected data in a process of "Inductive Reasoning" (NFPA 921
Section 4.3.5 and Section 19.5). The cause hypotheses developed were developed as the result of
the collection and analysis of the cause data. (Ex. 2, pp. 19-20.)

6)      "Test hypotheses" – NFPA 921 (Section 4.3.6 and Section 19.6.1-19.6.4.4)
describes the testing of cause hypotheses as "Deductive Reasoning." (NFPA Section 19.6.2)
Specifically calls out a knowledge comparison to the facts "Testing of the hypothesis is done by
the principle of deductive reasoning, in which the investigator compares the hypothesis to all the

known facts as well as the body of scientific knowledge associated with the phenomena relevant to the specific incident. Ultimately, the cause determination is arrived at through the testing of cause hypotheses." (NFPA 921 Section 19.6.4) reads in part "Hypothesis testing may include any application of fundamental principles of science, physical experiments or testing, **cognitive** experiments, analytical techniques and tools, and systems analysis."

      7)     "Select final hypothesis" – NFPA 921 Section 19.7 describes an iterative process in which you first double check that all "credible" data has been accounted for and all "credible" alternate cause hypotheses have been considered. (NFPA 921 Section 19.7.) "Once the hypotheses regarding the "cause" of the fire have been tested, the investigator should review the entire process to ensure that all credible data are accounted for, and all credible alternate cause hypotheses have been considered and eliminated." This is accomplished through careful and thorough consideration of the data from steps 3-6 noted above.

      Moreover, and directly contrary to Broan's argument that physical testing is required, an argument advanced without any case law support, NFPA 921 does not require that physical, experimental or laboratory type testing be performed in order to test a hypothesis. Rather, NFPA 921 specifically and plainly provides that deductive reasoning and cognitive testing may satisfy the testing requirement:

> It is important to understand that testing the hypothesis does not refer to only experimental testing, such as in a laboratory. Testing the hypothesis can be either cognitive or experimental. For example, during the testing and analysis of a hypothesis, the investigator will cognitively test the hypothesis on the basis of his or her knowledge and experience. Cognitive testing is the use of a person's thinking skills and judgment to evaluate the empirical data and challenge the conclusions of the final hypothesis.

_Woods Hole Oceanographic Institution,_ 2021 WL 9860239, at *5, quoting _Ali v. Travelers Home and Marine Ins. Co._, No. 1:17-cv-03192-ELR, 2019 WL 5106278, at *4 (N.D. Ga. Sept. 4, 2019)

(also quoting *Great N. Ins. Co. v. Ruiz*, 688 F. Supp. 2d 1362, 1373 (S.D. Ga. 2010)); see also *Erie Ins. Co.*, 2015 U.S. Dist LEXIS 2437, at *18 ("Although [the expert] did not perform physical experiments to test his hypothesis, NFPA 921 specifically provides that testing is done by the principle of deductive reasoning."); *All State Ins. v. LG Elecs. USA, Inc.*, 2021 WL 2875603, at *4 (E.D. Pa. July 8, 2021) ("NFPA standards do not require physical experimentation"); *Adams v. J. Meyer Builders, Inc.*, 671 F. Supp. 2d 262, 273 (D.N.H. 2009) (NFPA does not, in fact, require experimental tests as to cause and courts have rejected challenges to expert testimony based on a failure to do so); *Shuck v. CNH Am. LLC*, 498 F.3d 868, 875 (8th Cir. 2007) (NFPA 921 provides no bright line rule that expert opinions in fire cases always must be supported by testing); *Westfield Ins. Co. v. J.C. Penney Corp.*, 466 F. Supp. 2d 1086, 1094 (W.D. Wisc. 2006) (electrical engineer's opinion that lamp cord was defective and that arcing in the cord caused the fire was sufficiently reliable under *Daubert* to be admitted at trial); (*Windham v. Circuit City Stores, Inc.*, 420 F. Supp. 2d 1206, 1212 (D. Kan. 2006) (electrical engineer's proffered testimony regarding cause of a kitchen fire was sufficiently reliable to warrant admission even though engineer did not conduct any physical tests where engineer employed physical investigation, professional experience and technical knowledge to determine causation). Broan does not even cite let alone attempt to distinguish the weight of case authority holding that NFPA 921 does not require physical testing. Plainly the NFPA does not always require physical testing to test a hypothesis, and the case law firmly so holds. This is a reality Broan's expert, Stephen Campolo, concedes, as he must, in his deposition. (Ex. 7, Stephen Campolo Transcript, pp. 91-96) The well-reasoned controlling law requires the rejection of Broan's argument that Pratt's opinions are unreliable because of the absence of physical testing.

The gist of Broan's argument in support of the Motion to Exclude is best summarized on page 13 of Broan's Memorandum in Support of Motion to Exclude. Broan argues that Pratt's opinions must be excluded because (1) Pratt "performed no tests and relied upon no tests by others" and (2) Pratt "cites to no publications or treatises…" (Broan Memorandum in Support of Motion to Exclude, p. 13) These grounds are directly contrary to NFPA 921, which unambiguously endorses cognitive testing without physical tests and as the caselaw holds. It is also contrary to the multiple publications referenced in the Pratt Report and his deposition testimony. (See Ex. 2, pp. 3 and 8), (Ex. 3, 28:8-24, 30:1-18, 31:9-12.)

To suggest Mr. Pratt performed no tests, relied on no tests by others and cites no publications or treatises is badly misguided. Pratt's Report documents a lab inspection including photographs of the subject fan's scroll cage. The photographs show a metal surface with a wire arc welded to the surface and that surface is far from "smooth" even in the photographs. (Ex. 2, photos #6 and #7, p. 16.) Additionally, Pratt's Report notes Pratt's use of no less than ten well known industry treatises, handbooks, and publications. (Ex. 2, pp. 3 and 8.) The abrasion of the wire, stems from a knowledge of the friction involved in applications of steel, was addressed through Pratt's knowledge, use and reference to several enumerated publications. (Ex. 2, pp. 3 and 8.) NFPA 921 Sections 26.5.7, Hydraulic Braking System and 26.15.6.5, Brakes, both talk about the friction involved in braking systems with "smooth" steel components. The friction involved is directly related to an ability to cause abrasion. Further reference as listed in Pratt's "materials referenced" section is "Kirk's Fire Investigation, 7th Edition." Furthermore, Chapter 9, page 391 of Kirk's Fire Investigation, 7th Edition, contains the following: "The motion produced when the vehicle is moved or when fans, ventilators, or air conditioning units are operated can chafe wire insulation or loosen connections far more than would be expected in fixed structures."

14

Any argument that Pratt did not rely upon treatises or publications in reaching his expert opinion is disingenuous at best and belied by the record.

It should also be specifically noted that, contrary to Broan's specious argument, no Broan expert proffered any opinion that rodents were involved. Both Jim Seippel, on behalf of Broan, and James Rogers of Bay State Inspectional Agency, also on behalf of Broan, were at the scene for the joint examination. No evidence was found, and no mention of rodent activity occurred. Hypotheses are developed as the byproduct of analysis of the collected data in a process of inductive reasoning. If no evidence of rodent activity was observed or even noted during the data collection stage, the "rodent hypothesis" need not be addressed. This completely unsupported hypothesis was created by Broan's counsel during Pratt's deposition after all expert opinions were written, opinions without a whisper of a suggestion that rodent cause was present. This Hail Mary argument should be disregarded.

Finally, Broan has unquestionably failed to meet its high burden in seeking to exclude Pratt's opinions. Although Broan's high burden has not been satisfied, Pratt, respectfully, stands ready to proffer live testimony to address any issues or clarifications the Court may have or desire.

## V.   <u>CONCLUSION</u>

"It is not this Court's role, however, to determine which expert is correct. <u>See</u> <u>Lawes</u>, 963 F.3d at 106 ("<u>Daubert</u> neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance."). "So long as 'the expert's conclusion has been arrived at in scientifically sound and methodologically reliable fashion,' the expert's testimony should be allowed." <u>Woods Hole Oceanographic Institution</u>, 2021 WL 9860239, at *6.

It is clear from the Pratt Report that his opinion testimony is based on sufficient facts and data. It is unquestionably the product of scientifically sound methodology and reliable principles and methods established by the gold standard of the NFPA 921. Pratt's opinions reflect a reliable application of the well-established principles and methods to the facts of the case, supported as well by generally accepted scientific literature and his own training, education, and experience in the fields of fire, science, and engineering. The trier of fact must, as a matter of law, be left to determine which expert is correct.

For the forgoing reasons, the Plaintiff respectfully request that Broan's Motion to Exclude be denied.

Dated: 01/05/24

Respectfully submitted,
LIBERTY MUTUAL INSURANCE
COMPANY a/s/o MARC RYSMAN
By its attorney,

Paul Valentino, Esquire
Law Offices of Cain & Geller
Mailing address: P. O. Box 6835
Scranton, PA 18505-6835
Direct Dial: (617) 867-4712
BBO# 567962
Paul.Valentino@LibertyMutual.com

CERTIFICATE OF SERVICE

     I, Paul Valentino, Attorney for the Plaintiff, Liberty Mutual Insurance Company, hereby certify that I have this day served a copy of the foregoing PLAINTIFF, LIBERTY MUTUAL INSURANCE COMPANY a/s/o MARC RYSMAN'S OPPOSITION TO DEFENDANT BROAN-NU TONE LLC'S MOTIONTO EXCLUDE UNRELIABLE OPINIONS OF JEREMIAH PRATT, and by e-mailing a copy to:

Christopher A. Duggan, Esq.
Andrew Black, Esq.
Smith Duggan Buell & Rufo LLP
55 Old Bedford Rd.
Lincoln, MA 01773
Chris.Duggan@smithduggan.com
andrew.black@smithduggan.com


Dated:   01/05/24

Paul Valentino, Esquire