UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Liberty Mutual Insurance Company a/s/o Marc Rysman,<br><br>    Plaintiff,<br><br>v.<br><br>Broan-NuTone LLC,<br><br>    Defendant. | Civil Action Number: 1:21-cv-11986 |

**REPLY TO PLAINTIFF'S OPPOSITIONS TO BROAN-NUTONE LLC'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE UNRELIABLE OPINIONS OF JEREMIAH PRATT**

I.    INTRODUCTION

Plaintiff Liberty Mutual's oppositions (doc. 38 & 39) do not address the merits of Broan's motions. Liberty Mutual's loud silence in response to any of Broan's principal arguments on the merits proves that in fact it has no answers. Jeremiah Pratt, Liberty Mutual's retained liability expert, admitted he does not contend the ceiling fan in the Rysman house was defective. (Ex. 3, Pratt 169:22-170:3.) Mr. Pratt has no scientific basis for concluding that the fire could have started from the insulation on the wires in the wiring compartment abrading away. Consequently, Broan is entitled to summary judgment under Fed. R. Civ. P. 56.

Broan submits this reply memorandum, however, to address a few points in which Liberty Mutual's opposition may create some confusion, especially where Liberty Mutual cited to material that is not in the summary judgment record.

II.   ARGUMENT

    A.   **In the Opposition, the Plaintiff Falsely States That Broan Argued That "Physical Testing Is Required." (Doc. 38, p. 12.)**

Broan, in its memorandum, listed the factors this Court may consider in evaluating a *Daubert* challenge, which included the presence or absence testing by the hired expert to prove a hypothesis. (Doc. 37, p. 13.) Specifically, Broan argued, correctly, that the Court "may consider factors including whether the theory or technique has been tested; whether it has been subjected to peer review and publication; in the case of a technique, its known or potential rate of error as well as the existence and maintenance of any standards controlling its operation; and the extent of its acceptance within the relevant scientific community." *Netherlands Insurance Company v. HP, Inc.*, 646 F.Supp.3d 139, 145 (2022). Admittedly, Mr. Pratt in fact did not perform any testing to determine whether his hypothesis of how the fire started was even possible. (Ex. 2; ex. 3, Pratt 148:1-149:4.) Without testing, Mr. Pratt's opinion on causation is inadmissible unless Liberty Mutual can point to some other basis supporting Mr. Pratt's opinions more than just "because I said so." In fact, he did not, which is one of the reasons that his opinion is no more than an inadmissible guess.

    B.   **Mr. Pratt Did Not Rely Upon Any Treatise; the Treatises Liberty Mutual Identified in Its Opposition Are Inapplicable to Mr. Pratt's Challenged Opinion.**

In its opposition, Liberty Mutual identified two treatises that relate to fires in vehicles, not in stationary structures like the Rysman's home. (Doc. 38, p. 14.) The first reference was to two sections of NFPA 921: § 26.5.7 (Hydraulic Braking System) and § 26.15.6.5 (Brakes).[1] Liberty Mutual valiantly tries to stretch NFPA 921 sections dealing with motor vehicle braking

---

[1] Liberty did not make either NFPA 921 or Kirk's Fire Investigation part of the summary judgment record. (See Exhibits 9 and 10 to this reply brief.)

2

systems to apply to ceiling fan appliance wiring. To make this Olympian long jump, Liberty Mutual offers that "both talk about the friction involved in braking systems with 'smooth' steel components" (doc 38, p. 14), but there is no mention of "smooth" steel in either NFPA 921 reference.[2] In point of fact, neither provision discusses the potential of insulation on UL Recognized wire wearing away in a ceiling fan. That is no surprise because there is nothing in the fan housing that would cause damage to the insulation on the appliance wiring.

The fire at the Rysman's home was in a house, not a vehicle. Mr. Pratt contends it originated in UL Recognized appliance wiring, not in a motor vehicle braking system, which in fact works on friction. It is telling that Mr. Pratt did not rely (and could not have relied) upon these sections of NFPA 921 in either his report or his deposition testimony. Neither provision

---

[2] The 2021 edition of NFPA 921 (ex. 9) states:

    26.5.7 Hydraulic Braking System. The hydraulic braking system is activated by a foot pedal connected, through the power brake booster to a master cylinder. This master cylinder is connected with steel tubing to the wheel cylinders on drum brakes and calipers on disc brakes. Pressing the brake pedal produces higher pressure in the braking system, which is transmitted to the wheel cylinders and calipers. This pressure brings the brake linings (shoe and pads) in contact with the brake drums or rotors, creating friction. which stops the vehicle. Brake systems work under high pressures, and even a small leak can produce a spray that can be ignited if it contacts an ignition source. Brake systems also contain spare fluid that is held in a reservoir that is never pressurized. The purpose of the spare fluid is to replenish the master cylinder as me system takes in fluid during normal wear of the brake linings. The reservoirs on most vehicles are made of a plastic material that can melt during an engine compartment fire. If that occurs, the brake fluid in the reservoir will serve as a secondary fuel and accelerate the fire in the area of the master cylinder. Brake fluid can be expelled due to damage to the reservoir or a missing or dislodged cap and may provide the first fuel ignited.

    26.15.6.5 Brakes. Agricultural equipment may be equipped with disc or drum brakes. Some equipment may be equipped with park brakes. Friction heat generated through normal braking operations is easily handled by the design of the system and the types of materials used. When brakes are misapplied, excessive friction heat occurs. Misapplication of brakes can occur in situations where the equipment operator fails to release the park brake before moving the machine, repeatedly uses brakes for steering, or improper replacement/adjustment of brake components.

3

says anything about appliance wiring abrading on a smooth steel scroll, which certainly is why he did not mention them. These NFPA 921 sections are completely unrelated to the appliance wiring in a ventilation fan.

The plaintiff's reference to *Kirk's Fire Investigations* (7th ed.) also relates to vehicles, not fixed structures such as the Rysman's home. The two sentences preceding those cited by Liberty Mutual makes the context in *Kirk's Fire Investigations* abundantly clear:

> The location, thickness, and spacing of the structural members and the installation of electrical and heating equipment are considerably more variable in mobile homes than in conventional structures. (Walls are often framed and erected after carpet is laid across the entire floor area, for instance.) *The motion produced when the vehicle is moved* or when fans, ventilators, or air-conditioning units are operated can chafe wire insulation or loosen connections *far more than would be expected in fixed structures*.

(Ex. 10 (emphasis added).) The reference is expressly to fans in mobile homes, which, as the text explains, have different construction than fixed, conventional structures such as the Rysman's house. Also, mobile homes are moved after wires are installed. The quoted language is, on its face, inapplicable to the Rysman's home, and in fact demonstrates why the reference to *Kirk's Fire Investigations* is at best inapt. Of course, there again is no reference to chafing in appliance wiring in ceiling fans installed in a fixed structure against smooth steel.

Mr. Pratt did not rely upon any treatise that provides that wires can be compromised by chafing against smooth steel. Mr. Pratt may have read "no less than ten well known industry treatises, handbooks, and publications" (doc. 38, p. 14) but he certainly did not rely upon any of them to support either of his main contentions that (1) the insulation on the UL Recognized appliance wiring deteriorated by abrasion (against the smooth steel scroll) prior to the fire and (2) the resulting arc ignited the fire. The absence of support in the peer-reviewed literature, like his failure to subject his hypothesis to any objective testing, demonstrates that his proffered opinions on the cause of the fire cannot be given to the jury.

C.  **The Scroll Was Smooth Prior to the Fire and There Is No Evidence to the Contrary.**

The steel scroll was smooth before the fire.  (Ex. 7, Campolo 56:5-12 (an unburnt exemplar scroll was "extremely smooth and free of sharp edges, burrs, or any other type of irregularities.").)  That is the only evidence in the summary judgment record regarding the character of the scroll prior to the fire.  Mr. Pratt does not opine otherwise.  (Ex. 2, 3.)  The plaintiff's characterization of the *post-fire* scroll as "far from 'smooth'" based upon post-fire photographs (doc. 38, p. 14) does not change the evidence regarding the smoothness of the pre-fire scroll.[3]  It certainly would not be surprising that a piece of metal that had been attacked by fire and hit with high pressure water from fire fighters might oxidize before the pictures from a laboratory examination were taken.

D.  **Mr. Pratt and Liberty Mutual Still Offer No Evidence That There Was a Design Defect in the Fan or That Any Defect in the Fan Caused the Fire.**

Neither opposition offered by Liberty Mutual addresses the critical and honest admission of Mr. Pratt that he did not hold the opinion that the fan was defective.  At the end of his deposition, when asked that very question, Mr. Pratt stated that he "did not claim in this report that [the fan] was defective."  (Ex. 3, Pratt 169:22-170:3.)  Liberty Mutual attempts to dismiss this straightforward admission as merely one statement in the deposition (doc. 39, p. 4), as if it does not count unless the same question is asked and answered several times.  Once is enough.

---

[3] The post-fire galvanized steel scroll appears rusted (ex. 2, photo 6 on p. 16 of 39), which happens when the protective zinc coating on steel melts during a fire and the steel is sprayed with water during fire suppression.  (Ex. 11, NFPA 921-2021 6.3.11.2 ("With mild heating, bare galvanized steel may acquire a dull whitish surface due to oxidation of the zinc coating. This oxidation may also eliminate the corrosion protection that the zinc provided. If the unprotected steel is wet for some time, it will rust, which is another form of oxidation. Thus, there can be a pattern of rust compared to non-rusted galvanized steel.").)

This was no inadvertent mistake. The report does not state that the fan was defectively designed. At deposition, Pratt admitted that he did not claim in his report that the fan was defective – making further inquiries along this line unnecessary. Moreover, Mr. Pratt had the opportunity to read the transcript and provide an errata sheet had he chosen to change his testimony on this central point in the case; he did not.

Faced with this dispositive problem, and unable to do anything else, Liberty Mutual attempted to sidestep the substance of Mr. Pratt's admission in the hopes that it would disappear or be forgotten. It did not disappear and cannot be ignored. While Mr. Pratt opines that the fan caused the fire because the insulation wore off, he does not opine that the fan was defectively designed and that defect within the fan caused the fire. (Ex. 3, Pratt 169:22-170:3.) This is yet another reason why Broan is entitled to summary judgment on the design defect count.

### E. The Oppositions, Like Mr. Pratt's Report, Do Not Identify a Manufacturing Defect.

Finally, Liberty Mutual's oppositions do not identify any manufacturing defect. Nor did Mr. Pratt contend there was a manufacturing defect in the fan taken from the Rysman bathroom. Broan is therefore entitled to summary judgment on the manufacturing defect claim, as well.

III.  CONCLUSION

For the foregoing reasons, and the for the reasons set forth in Broan's Memorandum in Support of Broan-NuTone LLC's Motion for Summary Judgment and Motion to Exclude Unreliable Opinions of Jeremiah Pratt, the Court should exclude Mr. Pratt's proffered opinions which do not meet the basic *Daubert* standards, enter Summary Judgment for Broan on all counts in the Complaint, and dismiss the action.

                    Respectfully submitted,

                    BROAN-NUTONE LLC
                    By its attorneys,

                    /s/ Christopher A. Duggan
                    Christopher A. Duggan (BBO No. 544150)
                    Andrew D. Black (BBO No. 669839)
                    Smith Duggan Cornell & Gollub LLP
                    55 Old Bedford Road
                    Lincoln, MA 01773
                    (617) 228-4400
                    Chris.Duggan@SmithDuggan.com
                    Andrew.Black@SmithDuggan.com

Dated:  January 19, 2024